Avadim Health, Inc. v. Daybreak Cap. Partners, LLC, 2021 NCBC 73.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

AVADIM HEALTH, INC.,

> Plaintiff/
> Counterclaim
> Defendant,

v.

CRAIG HARKEY d/b/a HARK
HEALTH SERVICES,

> Defendant,

v.

DAYBREAK CAPITAL PARTNERS,
LLC, and COMMUNITY HEALTH
GROUP, INC.,

> Defendants/
> Counterclaim
> Plaintiffs,

STEPHEN WOODY,

> Counterclaim
> Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 3334

**ORDER AND OPINION ON
PLAINTIFF AVADIM HEALTH, INC.,
AND COUNTERCLAIM DEFENDANT
STEPHEN WOODY'S JOINT MOTION
TO DISMISS**

1. **THIS MATTER** is before the Court on the 1 February 2021 filing of Plaintiff Avadim Health, Inc., and Counterclaim Defendant Stephen Woody's Joint Motion to Dismiss (the "Motion") brought pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Rule(s)").  (ECF No. 31 ["Mot."].)

2. For the reasons set forth herein, the Court hereby **GRANTS IN PART AND DENIES IN PART** the Motion.

> *Allen Stahl + Kilbourne, PLLC, by Robert C. Carpenter, Robert E. Dungan, and Jesse M. Swords, for Plaintiff and Counterclaim Defendant Avadim Health, Inc.*

*Buchanan Ingersoll & Rooney PC, by Terry M. Brown, Jr., and Stanley Yorsz, for Plaintiff and Counterclaim Defendant Avadim Health, Inc. and Counterclaim Defendant Stephen Woody.*

*Robinson, Bradshaw & Hinson, P.A., by Benjamin DeCelle, and Pearlynn Houck, and Faegre Drinker Biddle & Reath LLP, by Matthew B. Kilby, James L. Volling, and Bryan K. Washburn, for Defendant Craig Harkey d/b/a Hark Health Services, and Defendants and Counterclaim Plaintiffs Community Health Group, Inc., and Daybreak Capital Partners, LLC.*

Robinson, Judge.

## I. INTRODUCTION

1. Defendants and Counterclaim Plaintiffs Daybreak Capital Partners, LLC ("Daybreak") and Community Health Group, Inc. ("CHG") (collectively the "Counterclaim Plaintiffs"), have asserted counterclaims against Plaintiff and Counterclaim Defendant Avadim Health, Inc., ("Avadim") for breach of contract, tortious interference with contract, tortious interference with prospective economic advantage, fraud, unjust enrichment,[1] violation of the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTP Act"), and violation of the North Carolina Racketeer Influenced and Corrupt Organizations Act (the "N.C. RICO Act"), and have asserted counterclaims against Counterclaim Defendant Stephen Woody ("Woody") for tortious interference with contract, tortious interference with prospective economic advantage, fraud, violation of the UDTP Act, and violation of the N.C. RICO Act (the "Counterclaims"). (Defs.' Answer and Countercls., ECF No. 22 ["Countercls."].)

---

[1] Avadim did not move to dismiss the unjust enrichment counterclaim. (*See* Mot.) Therefore, the Court does not address that claim in this Opinion.

2. In short, these claims arise from Counterclaim Plaintiffs' assertions that Avadim has breached the Letter of Intent (the "LOI") agreed to by the parties, and that Avadim and Woody have interfered in Counterclaim Plaintiffs' business in the "business-to-business" market (the "B2B market").

## II. FACTUAL BACKGROUND

3. Avadim is a healthcare company in the business of selling topical products designed to improve health. (Countercls. ¶ 1.) At all relevant times Woody was Avadim's Chief Executive Officer and served on Avadim's Board of Directors. (Countercls. ¶ 2.)

4. Counterclaim Plaintiffs allege that Avadim has not traditionally considered the B2B market to be one of its target markets. (Countercls. ¶ 6.) Avadim's only effort to develop a B2B market for its products—the Community Health Business unit (the "CHB Unit")—was unsuccessful, and, in 2020, Avadim decided to cease pursuing the B2B market strategy and terminate the employees working in the CHB Unit, except for one, Stan Payne ("Payne"). (Countercls. ¶¶ 7, 8.)

5. Upon notice that the CHB Unit would be shut down, Payne and coworker Craig Harkey ("Harkey") attempted to persuade Avadim to keep the CHB Unit. (Countercls. ¶ 9.) When Avadim insisted on closing the unit, Woody and David Fann ("Fann"), then-president of Avadim, suggested that Payne and Harkey should "raise money and buy the exclusive right to distribute and market products in that market from Avadim[,]" if Payne and Harkey believed it to be a lucrative venture. (Countercls. ¶ 9.)

6.    Payne and Harkey thereafter engaged Daybreak and established a team of individuals to help with the transition and to acquire the CHB Unit's business from Avadim.  (Countercls. ¶ 10.)

7.    Avadim and Daybreak then signed the LOI, which became effective on 20 March 2020, setting out the terms governing the sale of Avadim's CHB Unit to Daybreak.  (Countercls. ¶¶ 11–12.)  Additionally, Counterclaim Plaintiffs allege that Hark Health Services and a "to be formed acquisition entity," which later came to be CHG, were expressed and intended beneficiaries of the LOI.  (Countercls. ¶¶ 11–12.) The LOI granted the buyers an exclusive and perpetual right to distribute and market Avadim products in the B2B market.  (Countercls. ¶ 13.)  Among other terms, the LOI provided: the purchase price of the CHB Unit; the markets being purchased; the Avadim products CHG would exclusively distribute and market; the product pricing; exclusivity tied to required sales thresholds; and the duration, which was to be perpetual.  (Countercls. ¶ 112.)

8.    On 3 April 2020, the parties signed a second amendment to the LOI in which they agreed that the LOI had become effective on 20 March 2020.  (Countercls. ¶ 18.)

9.    Subsequently, in June 2020, Avadim and CHG entered into an interim "Distribution Agreement," which allowed CHG to start selling Avadim's products and create a network of sub-distributors in the B2B market before the LOI transaction was to be closed.  (Countercls. ¶¶ 26, 33.)  The interim Distribution Agreement was

to act as a precursor to the exclusive marketing and distribution agreement contemplated by the LOI. (Countercls. ¶ 26.)

10. Counterclaim Plaintiffs allege that "[o]nce Woody and Avadim realized that Payne, Harkey, CHG, and Daybreak were creating a business that would be capable of achieving more than $100 million in annual sales for CHG, [Woody and Avadim] secretly decided to stop negotiating in good faith to close the LOI Transaction." (Countercls. ¶ 54.)

11. Counterclaim Plaintiffs assert that Avadim and Daybreak agreed that the LOI became effective on 20 March 2020, that the LOI has not since been terminated, and that Avadim has breached the LOI and interfered in CHG's business in the B2B market.

12. The breach of contract counterclaim alleges that Avadim breached the "Good Faith Negotiations" term of Section 9, the "Past Practice" term of Section 10, and the "Competing Transactions" term of Section 11 of the LOI. (Countercls. ¶¶ 14, 98–123.)

13. Section 9 of the LOI required that Avadim and Daybreak "negotiate exclusively in good faith towards a successful Closing of the Transaction." (Countercls. ¶ 110.)

14. Section 10 of the LOI provides that Avadim and the CHB Unit are required to "afford to Buyer [Daybreak] and its agents and representatives full access at reasonable times to the Company's financial, legal, tax and other data and information to conduct its due diligence investigation of the Company and its

business and affairs." (Countercls. ¶ 100.) Section 10 further provides in the Past Practice term, that Avadim and its CHB Unit "use reasonable commercial efforts to . . . conduct its business only in the ordinary course and consistent with past practice." (Countercls. ¶ 102.)

15. Section 11 of the LOI provides that "Avadim could not, among other things, 'directly or indirectly . . . . solicit, initiate or encourage any discussions with . . . any person or entity with respect to the . . . Community Health business.'" (Countercls. ¶ 106.)

16. Counterclaim Plaintiffs maintain that the "Exclusivity Period" provided for in Section 11 of the LOI remains in effect. (Countercls. ¶ 23.) Counterclaim Plaintiffs contend that the Exclusivity Period has continued to renew for successive 30-day increments, because a definitive purchase agreement was never executed, and the parties never terminated the renewal provision of the LOI in writing. (Countercls. ¶¶ 20–23.) Counterclaim Plaintiffs further allege that in communications more than 90 days after the effective date of the LOI, all parties acknowledged and agreed that the LOI was still in effect. (Countercls. ¶ 24.)

17. Counterclaim Plaintiffs assert that Avadim abandoned the B2B market by the time the LOI became effective on 20 March 2020, but, by July 2020, Avadim had begun pursuing the same B2B markets and distributors that CHG developed for Avadim's products. (Countercls. ¶¶ 37–41.) Counterclaim Plaintiffs allege that by so doing, Avadim breached the Past Practice provision in Section 10 of the LOI. (Countercls. ¶¶ 35–36.)

18. Counterclaim Plaintiffs also allege that Avadim breached the LOI's "Competing Transaction" term contained in Section 11 by soliciting CHG's sub-distributors—BTW Distributors, LLC ("BTW"), ProKlean, and School Health—to distribute Avadim's products in the B2B market. (Countercls. ¶¶ 42–43.)

19. CHG continually provided updates to Avadim regarding its progress in developing the new company. (Countercls. ¶ 28.) "As a result of this continual reporting and its own active participation in CHG's sale efforts . . . Avadim had nearly complete visibility into both the customers CHG developed and each customer's expected initial order and annualized sales potential." (Countercls. ¶ 31.)

20. In addition, Counterclaim Plaintiffs allege that Avadim breached the LOI's "Good Faith Negotiation" provision contained in Section 9 of the LOI. (Countercls. ¶ 45.) In June 2020, Avadim allegedly refused to complete the transaction with Daybreak, even though the only two remaining drafting issues "were resolved in concept to the satisfaction of Avadim, Daybreak, and CHG[.]" (Countercls. ¶¶ 45–46.)

21. Counterclaim Plaintiffs maintain that, by July 2020, the parties had "agreed in concept on all material terms" of the LOI, and Avadim allegedly never identified any material item necessitating resolution prior to consummating the sale. (Countercls. ¶ 47.)

22. Nevertheless, on 6 August 2020, Woody, on behalf of Avadim, sent Jon Tebol, Daybreak's CEO, and David Hoffman, CHG's Board Chairman, an email proposing an alleged "better deal structure" that Counterclaim Plaintiffs believe "was

fundamentally inconsistent with the LOI." (Countercls. ¶¶ 48–50.) Counterclaim Plaintiffs further claim that the email, in bad faith, repudiated the deal contemplated by the LOI. (Countercls. ¶ 48.)

23. Counterclaim Plaintiffs allege that Avadim has, in bad faith, refused to engage in any further contract negotiations since the 6 August 2020 email. (Countercls. ¶ 52.) In addition, Counterclaim Plaintiffs assert that Avadim acted in bad faith by contacting other distributors in an effort to engage in business in violation of the LOI during the same period that Avadim was negotiating an exclusive distribution and marketing agreement with Counterclaim Plaintiffs. (Countercls. ¶ 53.)

24. Counterclaim Plaintiffs further allege that Avadim has breached the liquidated damages term of Section 9 of the LOI. (Countercls. ¶ 117.) According to Counterclaim Plaintiffs, Avadim did not close the transaction as agreed but instead pursued alternative business arrangements with other distributors in the B2B market that conflict with the final agreement contemplated by the LOI. (Countercls. ¶¶ 120–21.) As a result, Counterclaim Plaintiffs claim that Avadim and Woody owe a termination fee in the amount of $2.5 million plus reimbursement of reasonable out-pocket transaction expenses. (Countercls. ¶¶ 118, 122.)

25. Finally, Counterclaim Plaintiffs allege that Avadim and Woody interfered with CHG's business by soliciting CHG's sub-distributors directly to circumvent CHG and to encourage those sub-distributors to buy Avadim's products directly from Avadim. (Countercls. ¶¶ 74, 84–86, 89–90.) According to Counterclaim Plaintiffs,

Avadim knew that CHG's sub-distributors had agreed not to compete with CHG, and Woody allegedly assured CHG that Avadim would not attempt to circumvent CHG. (Countercls. ¶ 68.)

26. According to Counterclaim Plaintiffs, CHG has now lost nearly $60 million dollars in business and revenue due to Avadim and Woody's misconduct as described above. (Countercls. ¶¶ 95–97.)

27. Counterclaim Plaintiffs further allege that the factual scenario set out above supports claims for fraud, violation of the N.C. RICO Act, and violation of the UDTP Act. (Countercls. ¶¶ 159–64, 171–95.)

### III. PROCEDURAL BACKGROUND

28. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.

29. Avadim and Woody filed the Motion pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted on 1 February 2021. (Mot.)

30. The Motion is now fully briefed. (Pl. Avadim and Countercl. Def. Woody's Joint Mem. Law Supp. Mot. Dismiss, ECF No. 32 ["Mem. Supp."], Br. Countercl. Pls. Res. Avadim's and Woody's Mot. Dismiss, ECF No. 34 ["Mem. Opp'n"], and Pl. Avadim and Countercl. Def. Woody's Reply Mem. Supp. Joint Mot. Dismiss, ECF No. 38 ["Reply Br."].)

31. This matter was reassigned to the undersigned for further proceedings by the Chief Business Court Judge on 18 March 2021. (Reassign. Order, ECF No. 40.)

32. A hearing was held on the Motion on 13 April 2021. (*See* Not. Hearing and Case Mgmt. Conf., ECF No. 41.)

33. The Motion is now ripe for resolution.

## IV. LEGAL STANDARD

34. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the Complaint in the light most favorable to Plaintiff.[2] *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (quoting *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir. 2002)).

35. Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC.,* 251 N.C. App. 198, 206 (2016) (quoting *Laster v. Francis,* 199 N.C. App. 572, 577 (2009)). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6)

---

[2] Here, the Court will be reviewing allegations in the Counterclaims in the light most favorable to the Counterclaim Plaintiffs.

motion to dismiss into a Rule 56 motion for summary judgment. *Id.* (citing *Schlieper v. Johnson,* 195 N.C. App. 257, 261 (2009)). Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin,* 147 N.C. App. 52, 60 (2001) (citing *Robertson v. Boyd,* 88 N.C. App. 437, 441 (1988)).

36. Our Supreme Court has noted that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.,* 355 N.C. 161, 166 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "routinely uses . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at n.7 (citing *Krawiec,* 370 N.C. at 606 and *Christenbury Eye Ctr.,* 370 N.C. at 5).

## V.  ANALYSIS

37. Avadim and Woody request that the Court dismiss the Counterclaims for breach of contract, tortious interference with contract, tortious interference with prospective economic advantage, fraud, violation of the UDTP Act, and violation of the N.C. RICO Act.

## A.     Breach of Contract (Against Avadim)

38.     Counterclaim Plaintiffs' breach of contract claim is based on the alleged breach by Avadim of Sections 9, 10, and 11 of the LOI.  (Countercls. ¶¶ 99–123.)

39.     To properly plead a breach of contract claim, the claimant must allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000) (citing *Jackson v. Cal. Hardwood Co.,* 120 N.C. App. 870, 871 (1995)).  Where each of these elements are alleged, "it is error to dismiss a breach of contract claim under Rule 12(b)(6)."  *Woolard v. Davenport*, 166 N.C. App. 129, 134 (2004).

40.     Under North Carolina law, "a valid contract requires (1) assent; (2) mutuality of obligation; and (3) definite terms."  *Charlotte Motor Speedway, LLC v. Cty. of Cabarrus*, 230 N.C. App. 1, 7 (2013) (citing *Schlieper,* 195 N.C. App. at 261); *see also Elks v. N. State Ins. Co.*, 159 N.C. 619, 624 (1912) ("There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense." (cleaned up)).  Mutual assent is demonstrated by the parties through a showing of a "meeting of the minds," evincing an intent to be bound by definite terms. *Parker v. Glosson*, 182 N.C. App. 229, 232 (2007) (citing *Charles Holmes Mach. Co. v. Chalkley,* 143 N.C. 181, 183 (1906)).

41.     "A contract to enter into a future contract[,]" such as a letter of intent, "must specify all its material and essential terms" in order to be enforceable.  *Boyce v. McMahan*, 285 N.C. 730, 734 (1974) (citing *Croom v. Lumber Co.,* 182 N.C. 217, 220 (1921)).

42. Here, Avadim argues that the LOI lacks all material and essential terms. (Mem. Supp. 8.) Taking the allegations of the counterclaims as true, however, the Court disagrees. Counterclaim Plaintiffs have properly pleaded a breach of contract claim sufficient to withstand Avadim's Motion.

43. First, Counterclaim Plaintiffs have alleged sufficient facts to support the existence of a valid contract between the parties. (*See* Countercls. ¶¶ 98–123.)

44. The parties agreed in a second amendment to the LOI in April 2020 that the LOI became effective on 20 March 2020. (Countercls. ¶ 18.) According to Counterclaim Plaintiffs, the LOI, which became effective as of March 2020, specified the following terms of the agreement: the purchase price; the markets being purchased; the Avadim products CHG would exclusively distribute and market; the product pricing; exclusivity of required sales thresholds; and the duration. (Countercls. ¶ 112.)

45. Counterclaim Plaintiffs further allege that, by July 2020, any loose ends that may have been remaining as to the terms of the LOI were tied up, the parties had agreed in concept to all material terms and could have proceeded to complete the transaction, and that the remaining drafting issues had been resolved by the parties and Avadim did not identify any condition that Daybreak or CHG was unable to satisfy nor any material term needing resolution. (Countercls. ¶ 47.)

46. Additional events and circumstances surrounding the execution and the signing of the LOI support Counterclaim Plaintiffs' claim that the parties intended to be bound by the LOI in working towards a final transaction. *See JDH Capital,*

*LLC v. Flowers*, 2009 NCBC LEXIS 8, at **15 (N.C. Super. Ct. Mar. 13, 2009) (considering the circumstances surrounding the execution of the letter of intent involved in that matter to find whether it was intended by the parties to be a binding agreement).

47. In addition to the two amendments to the LOI negotiated by Avadim and Daybreak previously, in June 2020, the parties also entered into an interim Distribution Agreement, which allowed CHG to begin selling Avadim's products in the B2B market before the ultimate sale transaction was to be completed. (Countercls. ¶ 26.) These acts demonstrate the parties' mutual assent to be obligated to complete the contemplated transaction.

48. In short, viewing the allegations contained in the Counterclaims in the light most favorable to Counterclaim Plaintiffs, the Court concludes that Counterclaim Plaintiffs have sufficiently stated a claim for breach of contract against Avadim.

49. The Court thus denies the Motion as to the breach of contract counterclaim.

**B. <u>Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage (Against Avadim and Woody)</u>**

50. Counterclaim Plaintiffs bring Counterclaims against both Avadim and Woody for tortious interference with contract, as well as tortious interference with prospective economic advantage (collectively the "Tortious Interference Counterclaims"). (Countercls. ¶¶ 127–58.)

51. To state a claim for tortious interference with contract, a claimant must allege the following: "(1) a valid contract [exists] between the [claimant] and a third

person; (2) the [opponent] knows of the contract; (3) the [opponent] intentionally induces the third person not to perform the contract; (4) [opponent] in doing so acts without justification; [and] (5) resulting in actual damage to [claimant]." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (citing *Childress v. Abeles,* 240 N.C. 667, 674 (1954)).

52.    The difference between a tortious interference with contract claim and a tortious interference with prospective economic advantage claim is slight. *Lunsford v. ViaOne Servs., LLC*, 2020 NCBC LEXIS 111, at *13 (N.C. Super. Ct. Sept. 28, 2020).

53.    A tortious interference with prospective economic advantage claim arises when someone "induces a third party 'not to enter a contract with' the [claimant] when the contract would have resulted 'but for the interference.' " *Id.* (quoting *Dalton v. Camp,* 353 N.C. 647, 654 (2001) (internal citations omitted)).

54.    "In either case, the interference is actionable only if done 'without justification.' " *Id.* (quoting *United Labs., Inc.,* 322 N.C. at 661).

55.    Here, Counterclaim Plaintiffs allege that Avadim and Woody interfered with CHG's contract with BTW, by circumventing CHG and working directly with BTW while knowing that BTW was under contract with CHG "that prohibited BTW and its employees from working with any 'competing Company that operates, sells, or distributes similar [ ] Products[,]' " where "Products" includes the same products subject to the LOI.  (Countercls. ¶ 133.)

56. Additionally, Counterclaim Plaintiffs allege that Avadim and Woody caused both School Health and Proklean to refrain from entering into contracts with CHG that otherwise would have materialized but for the interference. (Countercls. ¶¶ 141–58.)

57. Avadim and Woody take aim at the Tortious Interference Counterclaims because they argue that Counterclaim Plaintiffs have failed to demonstrate the unjustifiable nature of the interferences alleged (element number four delineated above).[3]  (Mem. Supp. 9–12.)  Specifically, Avadim and Woody argue that Counterclaim Plaintiffs have not alleged facts sufficient to show that Avadim and Woody acted with the requisite malice. (Mem. Supp. 9–12.)  The Court disagrees.

58. "A motion to dismiss a claim of tortious interference is properly granted where the complaint shows the interference was justified[.]" *Pinewood Homes, Inc. v. Harris,* 184 N.C. App. 597, 605 (2007) (citing *Peoples Sec. Life Ins. Co. v. Hooks,* 322 N.C. 216, 220 (1988)).  "The interference is 'without justification' if the defendants' motives . . . were 'not reasonably related to the protection of a legitimate business interest' of the defendant." *Privette v. Univ. North Carolina,* 96 N.C. App. 124, 134 (1989) (quoting *Smith v. Ford Motor Co.,* 289 N.C. 71, 94 (1976)).

59. "Accordingly, . . . the complaint must admit of no motive for interference other than malice." *Id.* at 134–35; *see also Sides v. Duke Univ.,* 74 N.C. App. 331, 346

---

[3] Because Avadim and Woody attack only element number four (regarding justification for interference), the Court addresses only that issue here, and will not address whether Counterclaim Plaintiffs have established the other elements of tortious interference.

(1985). "General allegations of malice are insufficient as a matter of pleading." *Pinewood Homes, Inc.,* 184 N.C. App. at 605.

60. The malice required to sustain a tortious interference claim is legal, not actual, malice. *Childress*, 240 N.C. at 675. Legal malice "denotes the intentional doing of the harmful act without legal justification." *Id.* Not only must the complaint "admit of no motive for interference other than malice," but it must also provide "a factual basis to support the claim of malice." *Pinewood Homes, Inc.,* 184 N.C. App. at 605.

61. First, Avadim and Woody argue that the Counterclaim allegations stating that Avadim and Woody "had no motive for their interference other than malice," (Countercls. ¶¶ 139, 150, 156), are conclusory. Therefore, Avadim and Woody argue that those allegations need not be determinative in the outcome on a motion to dismiss. (Mem. Supp. 9–12.)

62. However, Counterclaim Plaintiffs also allege, among other things, that "Avadim had elected to abandon th[e B2B market] and terminate its employees" who were working on fostering the B2B portion of Avadim's business before the alleged interference. (Countercls. ¶ 37.) Counterclaim Plaintiffs allege that it was not until Avadim and Woody recognized that the B2B market would indeed be a profitable venture for CHG that they "abruptly performed an about-face," "secretly decided to stop negotiating in good faith to close the LOI Transaction," and "exhorted CHG to continue its efforts" all the while knowingly "pursuing the exact B2B business and

specific customers and distributors that CHG developed[.]" (Countercls. ¶¶ 38–39, 54–55.)

63. These factual allegations are sufficient to survive a motion to dismiss. *Compare Pinewood Homes, Inc.,* 184 N.C. App. at 605–07 (reversing the grant of a motion to dismiss on the tortious interference claim where the claimants had alleged several allegations tending to support the assertion of malice), *with Plasman v. Decca Furnit. (USA), Inc.,* 2016 NCBC LEXIS 80, **42–43 (N.C. Super. Ct. Oct. 21, 2016) (dismissing the tortious interference claims where the complaint contained no further allegations that defendants acted with legal malice other than to simply state that the actions were "maliciously intended"), *and Charah, LLC v. Sequoia Servs., LLC,* 2020 NCBC LEXIS 52, at *13–18 (N.C. Super. Ct. Apr. 17, 2020) (dismissing the tortious interference claim where the claimant stated in conclusory fashion that the actions were "malicious, willful, intentional, [ ] without justification[,] . . . [and] beyond the bounds of normal competitive behavior[,]" but did not plead any facts supporting those claims).

64. Second, Avadim and Woody argue that the Counterclaim Plaintiffs have affirmatively alleged in the Counterclaims that Avadim and Woody were justified in their interferences (if any), and therefore the Tortious Interference Counterclaims must be dismissed. (Mem. Supp. 9–12.)

65. The Court readily admits that " 'North Carolina's case law paints a less-than-clear picture' when it comes to distinguishing between justified and unjustified interference with contract." *Lenders Funding, LLC v. Waim Mgmt. Co.,* 2018 NCBC

LEXIS 67, at *5 (N.C. Super. Ct. July 6, 2018) (quoting *K&M Collision, LLC v. N.C. Farm Bureau Mut. Ins. Co.,* 2017 NCBC LEXIS 109, at *21 (N.C. Super. Ct. Nov. 21, 2017)). Because of this, North Carolina appellate courts have allowed for a case-by-case determination, by defining justification loosely as "just, lawful excuse" for the alleged interference. *Id.* (quoting *Childress,* 240 N.C. at 675).

66.     "Separating lawful from unlawful excuses depends on the nature of the underlying contract, the relationship between the relevant actors, and societal interests in permitting or deterring the conduct." *Id.* at *5–6 (citing *Peoples Sec. Life Ins. Co.,* 322 N.C. at 221).

67.     There is a "general principle that interference may be justified when the [claimant] and [opponent] are competitors." *Peoples Sec. Life Ins. Co.,* 322 N.C. at 222 (citing *Childress*, 240 N.C. at 667). When "defendant is acting for a legitimate business purpose, his actions are privileged. . . . [C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Id.* at 221.

68.     Here, Counterclaim Plaintiffs and Avadim and Woody were not competitors at all, according to the Counterclaims. In fact, Avadim had opted to exit the B2B market entirely and in turn work to transfer that portion of its business to Counterclaim Plaintiffs. (Countercls. ¶¶ 37, 103.) Counterclaim Plaintiffs' entire claim is premised on the fact that Avadim was not to be CHG's competitor but rather

its champion and supplier in pursuing the B2B business that Avadim was abandoning.

69. In *Lenders*, the Court denied the motion to dismiss a tortious interference claim because there were allegations sufficient to show that the alleged interferer acted without justification. 2018 NCBC LEXIS 67, at *5–8. Similarly, here, the nature of the LOI, the relationship between Avadim, Woody, CHG and Daybreak, and the societal interests in deterring the type of conduct alleged in the Counterclaims all weigh in favor of allowing the Tortious Interference Counterclaims to move forward.

70. Additionally, Counterclaim Plaintiffs' allegations forming the basis of their fraud counterclaim—which counterclaim survives this Motion also (*see infra*)—tend to support accusations of malice and lack of legal justification as well. *Cf. Window Gang Ventures, Corp. v. Salinas,* 2019 NCBC LEXIS 24, at *37 (N.C. Super. Ct. Apr. 2, 2019) ("Because [the] tortious interference claims rest upon allegations based in fraud, the Court concludes that the economic loss rule does not bar [the] tortious interference claims as pleaded here.") Even if the parties are competitors, arguably unfair competition furthered by fraud is not justified.

71. Because Counterclaim Plaintiffs have alleged facts sufficient to support a showing of malice, and the Counterclaims do not affirmatively demonstrate that Avadim and Woody were justified in their interferences, the Court denies the Motion as to the Tortious Interference Counterclaims.

## C.     Fraud (Against Avadim and Woody)

72.     Avadim and Woody also seek dismissal of the common law fraud claim pled against them by Counterclaim Plaintiffs.

73.     Counterclaim Plaintiffs must allege the five essential elements of a fraud claim: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, [and] (5) resulting in damage to the injured party." *Rowan Cty. Bd. Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17 (1992) (quoting *Terry v. Terry,* 302 N.C. 77, 83 (1981)) (cleaned up).

74.     First, Avadim and Woody seek dismissal of the fraud claim on the theory that, "[a]n unfulfilled promise is not actionable fraud, unless the promisor had no intention of carrying it out at the time of the promise." (Mem. Supp. 12–13 (citing *McKinnon v. CV Indus.,* 213 N.C. App. 328, 339 (2011)).)

75.     This is unpersuasive. Some of the alleged fraudulent statements are not mere "unfulfilled promises" at all but are rather alleged affirmative misstatements of then-existing fact. For instance, Counterclaim Plaintiffs allege that "Woody told Tebol, Harkey, and Payne during a telephone call held on or around April 1, 2020, that the deal reflected in the LOI had the express support of Avadim's Board of Directors and Hayfin"; however, Counterclaim Plaintiffs also allege that, "[m]onths after the LOI was signed, neither the entire Board of Directors nor Hayfin had been informed about the LOI and the Transaction." (Countercls. ¶¶ 61, 160(a).) These allegations, taken together, allege an affirmative misstatement of then-existing fact.

They do not allege an "unfulfilled promise," and therefore, the argument set forth by Avadim and Woody for dismissal of the fraud counterclaim is inapplicable.

76.     Second, though they cite no caselaw to support this theory, Avadim and Woody move to dismiss the fraud counterclaim on the additional theory that Counterclaim Plaintiffs have failed to properly allege damages as a result of their reliance on the alleged fraudulent assertions. (Mem. Supp. 12–13.) Avadim and Woody rest this argument on the premise that any alleged damages would have nevertheless been incurred in the operation of CHG's new business, even despite Avadim and Woody's statements and actions, and thus no damages were sustained by any such alleged fraud. (Mem. Supp. 12–13.)

77.     Counterclaim Plaintiffs allege that they "retained employees, dedicated time and resources to CHG, and developed a B2B market potentially worth hundreds of millions of dollars that Avadim has now deprived them of[,]" and that "Avadim has disrupted and sought to obtain for itself hundreds of millions of dollars of sales and potential sales to B2B customers that CHG procured[,] . . . . [and] already secured for itself millions of dollars in orders that CHG developed and quoted." (Countercls. ¶¶ 93, 163.)

78.     Counterclaim Plaintiffs have not affirmatively alleged that they would have proceeded in the same manner in developing CHG even despite the alleged fraudulent assertions made by Avadim and Woody. The Court need not engage at this stage of the proceeding in an exercise to assume how Counterclaim Plaintiffs might have proceeded with the development of CHG in the absence of the alleged fraudulent

assertions. Avadim and Woody have provided no supporting caselaw—and the Court has discovered none—that would allow the Court to draw the conclusion that it must disregard alleged damages based on the idea that Counterclaim Plaintiffs would have proceeded in the same manner in the absence of the fraudulent assertions, especially where, as here, Counterclaim Plaintiffs have alleged that they reasonably relied on the statements to their detriment.

79. Because the Counterclaims allege misrepresentations of then-existing material facts, and Counterclaim Plaintiffs have sufficiently set out that they reasonably relied on the false statements and were damaged by these alleged fraudulent assertions, Avadim and Woody's arguments for dismissal of the fraud counterclaim must fail and the Court hereby denies the Motion as to this claim.

**D.** **North Carolina Unfair and Deceptive Trade Practices Act (Against Avadim and Woody)**

80. Counterclaim Plaintiffs also assert a claim against both Avadim and Woody for violation of the UDTP Act, which Avadim and Woody seek to have the Court dismiss.

81. North Carolina has created a private right of action under Chapter 75 as part of its effort to protect consumers from unfair or deceptive trade practices. *See* N.C.G.S. § 75-1.1 (outlawing unfair and deceptive trade practices) and N.C.G.S. § 75-16 (creating a private right of action and authorizing treble damages). The three *prima facie* elements of a UDTP Act claim are: (1) an unfair or deceptive trade practice; (2) in or affecting commerce; and (3) proximately causing actual injury.

*Mitchell v. Linville,* 148 N.C. App. 71, 73–74 (2001) (citing *Spartan Leasing, Inc. v. Pollard,* 101 N.C. App. 450, 460–61 (1991)).

82.     While it is correct that a mere breach of contract cannot be the basis for a UDTP Act claim, this Court has held that claims for tortious interference with contract may form the basis of a UDTP Act claim. *Southern Fastening Sys. v. Grabber Constr. Prods.,* 2015 NCBC LEXIS 42, at *28–29 (N.C. Super. Ct. Apr. 28, 2015) ("[O]ur courts have long recognized that claims for . . . tortious interference with contract may form the basis of a UDTP [Act] claim[.] Because the Court has concluded that [the] claim[ ] for . . . tortious interference should survive [the] Motion to Dismiss, so should [the] claim for UDTP[.]"); *see also United Labs., Inc.,* 322 N.C. at 665.

83.     Here, the Tortious Interference Counterclaims have survived the Motion, as discussed above, and the Tortious Interference Counterclaims that have survived the Motion may form the basis for the UDTP Act counterclaim.

84.     Additionally, "[t]he case law applying Chapter 75 holds that a plaintiff who proves fraud thereby establishes that unfair or deceptive acts have occurred." *Bhatti*, 328 N.C. at 243; *see also Hardy v. Toler,* 288 N.C. 303, 309 (1975) ("[p]roof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts"), *and Tai Sports, Inc. v. Hall,* 2012 NCBC LEXIS 64, at **55 (N.C. Super. Ct. Dec. 28, 2012) (*Bhatti* held "that fraud constitutes a *per se* violation of the UDTP" Act).

85.     Here, the Fraud Counterclaim has survived the Motion as well, and may further form the basis for the UDTP Act counterclaim.

86. Therefore, the Motion is also denied as to the UDTP Act counterclaim.

**E.    North Carolina Racketeer Influenced and Corrupt Organizations Act (Against Avadim and Woody)**

87. Finally, Counterclaim Plaintiffs assert a claim against both Avadim and Woody for violations of the N.C. RICO Act, which Avadim and Woody seek to have dismissed.

88. The N.C. RICO Act prohibits persons from engaging in a pattern of racketeering activity or conducting or participating in an enterprise through a pattern of racketeering activity. N.C.G.S. § 75D-4(a). A "pattern of racketeering activity" is defined under North Carolina law as "at least two incidents of racketeering activity [with] the same or similar purposes, results, accomplices, victims, or methods[,]" within a four-year period. N.C.G.S. § 75D-3(b).

89. To properly state a claim under the N.C. RICO Act:

> (1) an "innocent person" must allege (2) an injury or damage to his business or property (3) by reason of two or more acts of organized unlawful activity or conduct, (4) one of which is something other than mail fraud, [or] wire fraud . . . (5) that resulted in pecuniary gain to the defendant[s].

*Gilmore v. Gilmore*, 229 N.C. App. 347, 356 (2013) (quoting *In re Bostic Constr., Inc.*, 435 B.R. 46, 68 (Bankr. M.D.N.C. 2010)).

90. "Racketeering activity" is defined by N.C.G.S. §75D-3(c)(1) as, "to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit an act or acts which would be chargeable by indictment if such act or acts were accompanied by the necessary mens rea or criminal intent[.]" Section 75D-3(c)(1) enumerates specific North Carolina statutory provisions, the violation of which will

serve as a predicate action to support a N.C. RICO Act claim. " 'Racketeering activity' also includes the description in Title 18, United States Code, Section 1961(1)." N.C.G.S. § 75D-3(c)(2).

91.    "It is not the intent of the General Assembly that [the N.C. RICO Act] apply to isolated and unrelated incidents of unlawful conduct but only to an interrelated pattern of organized unlawful activity, the purpose or effect of which is to derive pecuniary gain." N.C.G.S. § 75D-2(c).

92.    Counterclaim Plaintiffs allege that Avadim and Woody violated the N.C. RICO Act by: (1) engaging in wire fraud by using email and text messages to send a variety of fraudulent statements, (Countercls. ¶¶ 160–63, 179–80); (2) obtaining property by false pretenses by siphoning the B2B sales network, development plans and business model developed by Counterclaim Plaintiffs, (Countercls. ¶¶ 182–83); and (3) obtaining Daybreak's signature on the interim Distribution Agreement by false pretenses by falsely asserting that Avadim and Woody intended to complete the transaction contemplated by the LOI, (Countercls. ¶¶ 184–88).

93.    Counterclaim Plaintiffs further allege that all these activities occurred within a four-year period, and that all these incidents have a same or similar purpose, result, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics. (Countercls. ¶¶ 194–95.) Counterclaim Plaintiffs also contend that they were injured by these practices and that Avadim and Woody received pecuniary gain from these activities. (Countercls. ¶¶ 189–90.)

94. The Counterclaims further allege other instances of misconduct whereby Avadim "misappropriate[d]" business or otherwise did not pay for services that were rendered to it. (Countercls. ¶¶ 192–93.)

95. Our appellate courts have made clear that the N.C. RICO Act is intended to reach allegations of "organized crime" rather than the type of conduct that is alleged by Counterclaim Plaintiffs here. "The RICO statute was enacted in 1986 to remedy the problem of increasing organized crime." *State ex rel. Thornburg v. Lot & Bldgs. at 800 Waughtown St.,* 107 N.C. App. 559, 562 (1992) (discussing criminal gambling charges as predicate racketeering activity).

96. The allegations contained in the Counterclaims here closely resemble those in *Campbell v. Bowman,* where the North Carolina Court of Appeals held that "[t]he General Assembly did not intend that an investor's claim to recoup money lost through a failed financial venture with no larger criminal scope could be the basis of a RICO claim, [and] . . . [that] conduct is not within the scope of the [N.C.] RICO Act." COA05-16, 2005 N.C. App. LEXIS 2444, at *15 (Nov. 15, 2005) (unpublished).

97. Because the Counterclaims allegations do not sufficiently support a claim under the N.C. RICO Act, the Court grants the Motion as to the N.C. RICO Act counterclaim.

## VI.   CONCLUSION

98. For the foregoing reasons, the Court hereby **GRANTS IN PART AND DENIES IN PART** the Motion as follows:

a.  The motion to dismiss the breach of contract counterclaim is DENIED;

b.  The motion to dismiss the tortious interference with contract and prospective economic advantage counterclaims is DENIED;

c.  The motion to dismiss the fraud counterclaim is DENIED;

d.  The motion to dismiss the UDTP Act counterclaim is DENIED; and

e.  The motion to dismiss the civil N.C. RICO Act counterclaim is GRANTED.

**SO ORDERED**, this the 30th day of November, 2021.


/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
    for Complex Business Cases